**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**TERN SHIPHOLDING CORPORATION,
as owner and OSPREY SHIP MANAGEMENT
INC., as operator, of the M/V AMERICAN TERN,**

     **Petitioners,**


**vs.**                       **CASE NO. 5:04cv381-RS-EMT**


**JOHN ROCKHILL, and AMERICAN
MARITIME OFFICERS MEDICAL PLAN,**

     **Respondents.**

_____/


**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**


Before the Court are the Petitioners' Motion for Summary Judgment and the Respondents' Motions for Summary Judgment. The Petitioners (Osprey) ask the Court for declaratory relief providing that its legal obligation to provide maintenance and cure for Respondent John Rockhill (Rockhill) is complete (Doc. 48).  Respondent American Maritime Officers Medical Plan (AMO) asks the Court to hold that is not responsible for John Rockhill's expenses beyond $10,000 and confirm that the Petitioners remain obligated to pay Rockhill's maintenance and cure (Doc. 54). Finally, Rockhill asks the Court to confirm that Petitioners remain responsible for his maintenance and cure and to award punitive damages and attorney's fees against Opsrey (Doc. 57).


## I. Facts

Rockhill began working for Petitioner Osprey Ship Management Inc., (Osprey) on

February 23, 2000.  On November 8, 2002, Rockhill was assigned to work on the Osprey ship M/V American Tern. Rockhill left the Tern on November 24, 2002 due to an illness that left him unfit for duty. Subsequently, this illness was diagnosed as limited small cell lung cancer.[1] Small cell lung cancer is classified as either "limited" or "extensive." Limited small cell cancer is restricted to one "radiation port," while "extensive" occurs when the cancer metastasizes - i.e.  the cancer is no longer restricted to a lung and spreads to other parts of the body.  (Doc. 47, Dr. Nichols Deposition (Nichols), 5:3-13); (Doc. 46, Dr. Malamud Deposition (Malamud), 8:17-19). Limited small cell cancer is "potentially curable" while extensive small cell cancer is generally considered to be incurable. (Nichols, 5:5-7).

Limited small cell lung cancer is treated with both chemotherapy and radiation. (Malamud 8:18-19). Thus, from Rockhill's initial diagnosis in November 2002 until April 30, 2003, Rockhill's limited small cell lung cancer was treated through chemotherapy and radiation. The chemotherapy was provided by Dr. Malamud, and the radiation treatment was given by Dr. Nichols. The medical emphasis during this time period was on curing Rockhill of limited small cell lung cancer. (Nichols 21:13-25). On June 24, 2003, a MRI of Rockhill's brain was taken in order to determine whether the cancer had metastasized to the brain. At this juncture, there was still a chance that the treatment could still be "curative." (Nichols 21:21-25; 22:1). In June 2003, it was confirmed that Rockhill's cancer had metastasized to the brain, changing the cancer from limited to extensive and fundamentally altering the long term prognosis of Rockhill. (Nichols 13:2-10; 14:13-15); (Malamud 24:17-25; 25:1-6).[2]  By August 2003, there was a shift in

---

[1] There are two types of lung cancer, non-small cell lung cancer and small cell lung cancer. (Deposition of Malamud, 7:13-16). Small cell lung cancer has a different "biology" then non-small cell lung cancer and is "extremely aggressive." (Malamud 7:13-22).

[2] According to Dr. Malamud,  Rockhill's cancer was medically classified as limited small cell lung cancer with a brain metastasis despite the fact that Rockhill's cancer "behaved like extensive [small cell lung cancer]." (Malamud 8:15-25; 9:1-25). For purposes of ease and clarity, the Court will refer to Rockhill's cancer after the confirmed metastasis as "extensive."

treatment from cure to "hopeful remission, but not ever a cure." (Nichols 7:17-19) (Malamud 25:4-6; 28:8-11).

On September 11, 2003, Dr. Nichols determined that the cancer was in remission. Subsequently, on October 8, 2003, Dr. Nichols wrote a letter indicating that Rockhill could return to work without  "present[ing] a risk to himself or others." (Nichols 18:21-24). The letter did not contain any information regarding Rockhill's condition at the time. From December 10, 2003 through January 5, 2004, Rockhill returned to work for Osprey and was assigned to the vessel M/V LTV CALVIN P.TITUS. On January 5, 2004,  Rockhill and Osprey mutually agreed to terminate his employment with Osprey. On February 3, 2004, Dr. Malamud saw Rockhill again. At that point, Dr. Malamud told Rockhill that he had "recurrent disease in the brain," meaning that there was either an increase in the number of lesions on the brain or a new lesion in an area where there had been no lesion. (Malamud 27:1-11).

Osprey and AMO paid for Rockhill's medical bills from November 2002 until October 8, 2003, the day that Rockhill was cleared to work by his doctor. In February 2004, Osprey received invoices from Rockhill's medical providers for services rendered after Rockhill's discharge on January 5, 2004. Osprey declined to pay the invoices and asked Rockhill's medical providers to forward all future invoices to AMO. Osprey and AMO subsequently exchanged letters in which each party claimed that it was not responsible for Rockhill's expenses. Unable to come to a satisfactory resolution, Osprey then filed this action for declaratory relief.[3]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess

---

[3] Osprey has offered to split the cost of Rockhill's medical bills with AMO until the Court resolves this matter.

the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)). "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'"

Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

### III. Osprey's Legal Obligation to Provide Rockhill Maintenance and Cure

The primary issue in this case is whether Osprey must continue to provide maintenance and cure for Rockhill after his employment with Osprey ended on January 5, 2004. The doctrine of maintenance and cure is rooted in time. See e.g. Article VI of the Laws of Oleron ("the master ought to set him ashore, to provide lodging and candlelight for him...and likewise to afford him diet as is usual in ship"). Maintenance provides a "per diem living allowance" while cure "involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman." General maritime law and federal common law provide maintenance and cure to seamen who become sick or injured during their employment regardless of the negligence of the employer or seaworthiness of the ship. Maintenance and cure continues beyond the voyage until the seaman has reached "maximum cure."

In Farrell v. United States, 336 U.S. 511, 517, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the Supreme Court held that the Shipowner's Liability Convention (Convention), ratified by the United States Senate and proclaimed by President Roosevelt as effective for the United States on October 29, 1939, set out the law of maintenance and cure. Article 4, paragraph 1 of the Convention stated that "The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character."

5

The <u>Farrell</u> Court further held that the shipowner should provide maintenance and cure until the sailor is "so far cured as possible." <u>Id.</u> at 518. The Fifth Circuit interpreted <u>Farrell</u> and previous Supreme Court precedent to mean that maximum cure is reached when "it appears probable that further treatment will result in no Betterment of the seaman's condition." <u>Pelotto v. L & N Towing Co.</u>, 604 F.2d 396, 400 (5th Cir. 1979).[4] This standard is deceivingly simple as determining when an injured seaman has reached the point of maximum cure "is a troublesome task both factually and as a matter of law." <u>Id.</u> If a seaman's injury is incurable or if future treatment will only aid in reducing the seaman's pain and suffering, "but not otherwise improve the seaman's physical condition," the point of maximum cure is reached and the shipowner's responsibilities cease. <u>Id.</u>

The termination of maintenance and cure is not limited to the point at which the seaman is declared fit to return to work. <u>Lirette v. K&B Boat Rentals</u>, 579 F.2d 968, 968 (5th Cir. 1978)("...the cut-off point for maintenance and cure is not that at which the seaman recovers sufficiently to return to his old job but rather the time of maximum possible cure"). Finally, in determining whether a seaman is entitled to maintenance and cure, "any ambiguities or doubts" are to be resolved in favor of the seaman. <u>Flores v. Carnival Cruise Lines</u>, 47 F.3d 1120, 1123 (11th Cir. 1995) <u>quoting</u> <u>Vaughn v. Atkinson</u>, 369 U.S. 527, 532 (1962).

Osprey maintains that since the summer of 2003, or at the latest early 2004, Rockhill had reached maximum cure since there was no treatment available to cure extensive small cell lung cancer. AMO and Rockhill argue that precedent mandates that maximum cure is only reached when future treatment will not "improve the seaman's physical condition," and that Rockhill's "condition" continues to improve with treatment. <u>Pelotto</u>, 604 F.2d at 400.

In determining whether a seaman has reached maximum cure, the details of the

---

[4] In <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted the precedent of the former Fifth Circuit prior to September 30, 1981, as its binding precedent.

seaman's illness, particularly coming from the medical professionals involved in the care of the seaman, are invaluable. This case is no different. Rockhill's physicians' descriptions, diagnosis, and prognosis for his illness are critical to assessing whether he remains entitled to receive maintenance and cure. As a result, in describing Rockhill's medical condition, the Court will rely heavily on his doctors' direct testimony and will quote the most relevant parts. First, Dr. Malamud, in addressing Rockhill's condition upon his discovery that Rockhill's cancer had metastasized to the brain stated:

> Q. And does that change the disease from limited to extensive?
> A. Yes, sir.
> Q. And what is the significance of that ?
> A. Ominous...[t]he evidence of brain metastasis changes the spectrum from now, with a hope of a cure, with a hope from a cure to hopeful remission, but *not ever* a cure. (emphasis added)
> Q. So at that point there was no possibility for cure, but there is still hope for remission?
> A. Hope for remission, partial, whole, remission.
> Q. And within a reasonable degree of probability what is the standard as far as the probability of remission in that circumstance?
> A. Well, partial remission, over 50 to 75 percent, I would say, which means shrinking of the mass. Complete remission, less. Durable remission – a long time, durable remissions, over two, five years, – about zero.
> Q. Almost non-existent?
> A. Miracles can happen, I never shut the door to that.
> Q. And we don't discount miracles of things we can't explain in medicine, but as an oncologist, when you're looking at the medical probabilities–
> A. Extremely small
> Q. It's basically zero, the chances?
> A. Yes.

(Malamud, 24:17-25; 25:1-25)

Dr. Malamud's testimony is conclusive that upon the metastasis of the cancer, Rockhill's condition was incurable. At another point in his testimony, Dr. Malamud discusses the possible treatment options for Rockhill as of February 2004:

> Q. Doctor what is your definition of palliative treatment?
> A. Palliative treatment is a treatment that you use to prolong quality of life.
> Q. At that point, as of February 2004 what type of treatment did you propose?
> A. Salvage as well as palliative.

Q. What's the difference?
A. Basically none.
Q. And is that within a reasonable degree of medical probability?
A. Yes.
Q. When you saw Mr. Rockhill as of February 3, 2004, do you know of any treatment that will cure his cancer within a reasonable degree of medical probability?
A. Cure, No.
Q. Is the only treatment that is available to Mr. Rockhill as of February 3, 2004 palliative treatment a you've described in your deposition?
A. Yes.
Q. Is that within a reasonable degree of medical probability?
A. That is correct.
Q. Doctor, would you agree with me that this type of cancer that Mr. Rockhill has, as of February 2004 has less than a two percent survival rate?
A. Even less than that. Or maybe two percent, if not less.
Q. Doctor, isn't it true that the purpose of chemotherapy and radioactive treatment that Mr. Rockhill has been receiving since February 2004 was to postpone likely death from cancer and provide some quality of life to Mr. Rockhill?
A. Absolutely, yes.

(Malamud, 27:21-25; 28:1-25; 29:1-3)

Dr. Malamud's opinions concerning the incurable nature of Rockhill's illness and that any treatment after February 2004 was palliative in nature were shared by Rockhill's other physician Dr. Nichols, as the following testimony makes clear:

Q. Can small lung cancer that's extensive be cured?
A.  No.

(Nichols, 7:17-19)

Q. Am I correct in summarizing in that once [Rockhill's] cancer metastasized from his lung to his brain, it went from limited stage to an extensive stage, and at that point you [sic] were no longer a candidate for the prophylactic treatment?
A. That is true...[b]ut the bottom line is [Rockhill] has gone from being a candidate for cure, to really just a candidate for palliation, prolongation of life, whatever you want to call it. But he's really not considered a candidate for cure at this point.
Q. Why is that?
A. Because once the cancer has spread to the brain, the, although some patients do achieve disease control, it's, it's such a small share that they're really

considered to be not curable.

(Nichols, 15:22-25; 16:1, 9-18)

> Q.  As of February 2004, is there any known treatment that would cure Mr. Rockhill's small cell lung cancer that had metastisized into his brain, as he was in February 2004, within a reasonable degree of medical probability?
> A. No. I, I really, I would still consider him to be a palliative case at that point. I would consider it unlikely that we're going to permanently eradicate the cancer.
> Q. Doctor, the treatment that you were prescribing from February 2004 onward, isn't it true that the purpose of the chemotherapy and the radiation treatment was to postpone likely death from cancer and provide some quality of life [for Rockhill]?
> A. No radiation was delivered after 8-13-03. No radiation was delivered. But yes, the purpose–or no radiation was delivered by me. I believe he recently has received additional stereotactic treatment.
> Q. And I am referring to that as well.
> A. But at this point it is to delay death from cancer. But I would be dishonest to say that we are, we have a legitimate hope of preventing death from cancer, at least with what we have available to us, you know, as of April 21, 2005.

(Nichols,19:18-25; 20:1-14)

And finally, and perhaps most notably, Dr. Nichols summarizes his findings by stating:

> Q. After February 2004, is it your opinion within a reasonable degree of probability that there was virtually a zero percent chance that Mr. Rockhill would be able to defeat his cancer?
> A. Yes.

(Nichols, 22:2-6)

As of the date of the doctors' depositions, both doctors have exhausted the treatment options available to Rockhill. (Malamud, 37: 8-11)(stating "...I've pretty much achieved the end of the rope with systemic chemotherapy"); (Nichols, 24: 3-8)("I see him, I don't know if I would say on a social basis, but these are just sort of traditional follow-ups that we do").

The Court finds the testimony of the Rockhill's doctors to be credible, consistent, and determinative of the issue. From February 2004 onward, Rockhill had (and

9

continues to have) an incurable and permanent illness, and while he has miraculously beat the odds by surviving to this point, any treatment was and will continue to be for the purpose of controlling his symptoms, reducing his pain and suffering, and improving his quality of life. Having established Rockhill's medical condition at this stage, the law of maintenance and cure will now be applied to these facts.

Rockhill has asked the Court to take notice (Doc. 79) of two additional district court decisions - Costa Crociere S.p.A. v. Rose (Costa), 939 F.Supp. 1538 (S.D. Fla. 1996) and In re Petition of RJF International Corporation (RJF), 261 F. Supp. 2d 101 (D.R.I. 2003), and both cases are worth addressing in some detail. AMO also cites to these cases, and in particular Costa, as the "most compelling" and "applicable case." In both cases, the courts determined that the seamen were entitled to continued maintenance and cure. Each case will be analyzed in turn.

In RJF, a seaman suffered brain injuries when he fell off the ship he was working on. The vessel owner provided maintenance and cure for the injured seaman for over a year before petitioning the court for termination of those benefits. The vessel owner argued that the injured seaman had reached maximum cure due to the permanent nature of his condition. However, doctors on both sides appeared to agree that there was a "likelihood of future gains" in the seaman's medical condition, even though the doctors disagreed as to the appropriate facility for treatment. RJF, 261 F. Supp. 2d at 106. Ultimately, the testimony of the seaman's doctors (which the court relied on due to their familiarity with the seaman and his medical condition) led to the court's decision that maximum cure had not been reached in the case. Id. at 105. This case differs in at least two respects from RJF. First, the doctors in this case agree that while Rockhill's condition is also permanent, the "likelihood of future gains" in his medical condition is virtually nonexistent. Second, the court in RJF also held that a "shipowner is only responsible for treatment that is curative in nature, and not for medical care that is solely palliative such as the alleviation of pain and discomfort." Id. Unlike the situation in RJF, both of Rockhill's doctors agree that all further treatment will be "palliative" in nature.  Thus, while in RJF there was a possibility that the brain injuries sustained by the seaman would improve with treatment, none of the parties in this case, including

10

Rockhill's physicians, provide any evidence that there is a treatment available to Rockhill that will lead to an improvement in his illness.

In Costa Crociere, S.p.A v. Rose, the court addressed whether the duty of maintenance and cure extends to a situation where a seaman has a disease that is incurable under certain circumstances. The seaman in Costa had an incurable kidney disease that could be controlled through dialysis or a kidney transplant. Removing the seaman from the dialysis machine (or denying him the opportunity to have a kidney transplant) would have resulted in the seaman dying far quicker than he would have otherwise. In reaching their conclusion, the Costa court interpreted the guidelines for terminating maintenance and cure as set out in Pelotto and later reaffirmed by the Fifth Circuit in Gaspard v. Taylor Diving & Salvage Co., Inc., 649 F.2d 372 (5th Cir. 1981). The pertinent language is as follows:

> "The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition. Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely *relieve pain and suffering but not otherwise improve the seaman's condition*, it is proper to declare that the point of maximum cure has been reached." (emphasis added)

Pelotto, 604 F.2d 396, 400 (5th Cir. 1979); Gaspard v. Taylor Diving & Salvage Co., Inc., 649 F.2d 372, 375 fn.3 (5th Cir. 1981).

In Costa, the court found that the seaman was entitled to maintenance and cure for his incurable kidney illness because continued dialysis or a kidney transplant offered the possibility of "betterment" in the seaman's "condition." Costa focused on the Pelotto Court's use of the word "condition" and interpreted that to mean the physical condition of the body as a whole and not just the underlying disease. In Costa, both parties stipulated that the seaman would die without continued dialysis; but, if the seaman was given dialysis and/or a kidney transplant, he could live in a meaningful manner indefinitely. Thus, the treatment went beyond decreasing pain and suffering, but actually allowed the seaman to live a "normal" life. In its conclusion, the court summarized its findings, squaring them with its interpretation of Pelotto and Gaspard:

11

> "Under Pelotto and Gaspard, the point of maximum medical improvement is not reached until there is no possibility of a betterment in the seaman's physical 'condition.' The record establishes that dialysis and transplantation offer [the seaman] a reasonable chance of continuing life for an indefinite period of time at a meaningful level of functioning. The record also establishes that, without these treatments, [the seaman] faces certain and immediate death. The Plaintiffs cannot, under these facts and circumstances, meet their burden of proving that dialysis *and* transplantation do not offer a meaningful prospect of bettering [the seaman's] condition." (underlined portion added, italics in original opinion)

Costa, 939 F. Supp. at 1558-59. The facts in this case can be clearly distinguished from Costa. To a reasonable medical probability, Rockhill will not live indefinitely with treatment, despite the fact that he has managed to beat the odds thus far.  In fact, both of his doctors agree that treatment at this point is "palliative," not to "better" his physical condition. The Court does not discount the fact that treatment may extend his life for a period of time, but that issue alone is not enough to justify continued maintenance and cure. In other words, there is not a reasonable chance, from a medical perspective, that Rockhill will continue to function at a meaningful level with continued treatment. In another passage, the Costa court states:

> "For purposes of comparison, when the available treatment leaves the seaman feeling better without enhancing his bodily function and moving him to an improved state of health, then the point of maximum medical cure has been reached, and the shipowner's liability may be extinguished. Here, dialysis and transplantation will improve [the seaman's] condition in the most profound sense: by creating a reasonable prospect of life for an indefinite period of time at a reasonable level of functioning."

Id. at 1553. Once again, the Costa court stresses the fact that if the seaman receives treatment there will be a reasonable prospect of life for an indefinite period of time. Based on the testimony of Rockhill's physicians, treatment will not enhance his bodily function in the sense of permanently controlling or eradicating the illness. Also, while Rockhill may mentally feel better with continued treatment, from a medical standpoint, any improvements in his illness will be temporary at best, and ultimately, will not result in a cure. See also, Whitman v. Miles, 294 F.Supp. 2d 117 (D. Me 2003)(court denied seaman's request for past and future maintenance and cure because "[s]lowing or

arresting a decline [in the seaman's multiple sclerosis], while medically important, simply is not the same as effecting an improvement, the standard for maintenance and cure.") Of course, if new treatments become available that will control or eradicate the illness, Rockhill will be able to claim maintenance and cure again.

The Court recognizes the " fuzzy boundary" that exists between improvement and palliation. The Court also recognizes that stopping treatment at this stage may decrease Rockhill's life span. Nonetheless, keeping in mind that maintenance and cure is not the equivalent of long term disability insurance, the Court finds that the testimony from Rockhill's doctors demonstrate unequivocally that Rockhill's illness is permanent, incurable, and not subject to "betterment." As such, the Court finds that Rockhill has reached the point of maximum cure.  Osprey is not responsible for Rockhill's maintenance and cure beyond 2003.

## IV. AMO's Motion for Summary Judgment

In its Cross Motion for Summary Judgment, AMO has asked the Court for the following relief: 1) To deny Osprey's Motion for Summary Judgment; 2) To hold that AMO is not responsible for Rockhill's medical expenses beyond the $10,000 provided by their rules; and 3) To hold that Osprey remain obligated to pay Rockhill's medical expenses as part of their duty to provide him with maintenance and cure. The Petitioners ask the Court to deny AMO's Moton for Summary Judgment on the grounds that 1) None of the pleadings place the issue of AMO's liability in front of the Court; and 2) AMO has misconstrued the law of maintenance and cure. Having addressed Osprey's Motion for Summary Judgment, including the question of maintenance and cure,  the Court will focus on the remaining issue of AMO's obligation to Rockhill.

## A. Procedural Deficiencies

Osprey contends that none of the pleadings raise the issue of what AMO's coverage responsibilities are vis a vis Rockhill. In addition, Osprey claims that "no discovery was directed at this issue" by Osprey or Mr. Rockhill. The Federal Rules of Civil Procedure (FRCP) provide all litigants with the necessary procedural requirements

for filing a claim in federal court.  Fed. R. Civ. P. 8(a) sets out three requirements that must be met in order for a claim to be properly plead: 1) "A short and plain statement of the grounds upon which the court's jurisdiction depends..."; 2) "A short and plain statement of the claim showing that the pleader is entitled to relief";  and 3) "A demand for judgment for the relief the pleader seeks."

The liberal "notice pleading" standard embodied in Federal Rule of Civil Procedure 8(a)(2) does not require that a plaintiff specifically plead every element of a cause of action.  On the other hand, despite the liberal pleading requirements of the Federal Rules, a party cannot plead a claim for the first time in a motion for summary judgment. In order to comply with Rule 8, the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." In re Plywood Antitrust Litigation, 655 F.2d 627, 641 (5th Cir. Unit A Sept.8, 1981). See also St. Joseph's Hosp., Inc. v. Hospital Corp. of America, 795 F.2d 948, 954 (11th Cir. 1986) ("[T]he pleading must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.") Thus, at a minimum, a party is responsible for providing the others with "fair notice of [its] claim and the grounds upon which [its] claim rests" to satisfy Rule 8. 5 Wright and Miller, Federal Practice and Procedure, Civil 3d. § 1215; See also U.S. v. Baxter Intern., Inc., 345 F.3d 866, 881 (11th Cir. 2003).

None of the pleadings prior to AMO's Motion for Summary Judgment directly ask the Court to decide the issue of AMO's liability to Rockhill. However, there are several instances where the issue is broached by the parties. For example, Osprey's Complaint alleges that AMO is responsible for Rockhill's claims. (Osprey Complaint, ¶ ¶ 9-10; "It is only in the event maintenance and cure is not owed by [PETITIONERS?], RESPONDENT MEDICAL PLAN must pay"; "Petitioners believe they are not required to pay maintenance and cure to RESPONDENT ROCKHILL... [a]ccordingly, [AMO] should be required to pay those expenses under the terms of its agreement with Rockhill's union"). In its Answer, AMO responds to Osprey's claim in its Fourth Affirmative

14

Defense, stating that it "has acted in accord with its obligations under its Rule and Regulations and under ERISA." (AMO Answer, ¶ 16.)  Also, in Osprey's Motion for Summary Judgment, Osprey states that Rockhill was a member of AMO during the period he sailed aboard Osprey's vessels and that AMO has a medical plan for its members. (Osprey Motion for Summary Judgment, 12-13.)  Osprey attaches a copy of AMO's Medical Plan for the Court's reference to this motion. The Court finds it difficult to interpret Osprey's statements as anything but support for the proposition that AMO is responsible for Rockhill's medical care at this point. In addition, Osprey claims that there was no discovery directed at this issue. AMO's Responses and Objections to Petitioners' First Set of Interrogatories (Doc. 71-2) undermines that proposition as the document is replete with questions concerning AMO's Medical Plan and its coverage requirements. See e.g. Interrogatories 3, 4,5, and 6.

Overall, there are enough instances, implicitly and explicitly, in the pleadings and in the interrogatories, to have placed all parties on notice of this issue and satisfy the requirements of Fed. R. Civ. P. 8. The Court also holds that Osprey's Complaint contains enough "direct" and "inferential" allegations to support the view that Osprey was asking the court for a declaratory judgment on the issue.  As a result, it is appropriate to consider the issue of AMO's liability to Rockhill at this point. In addition, the Court recognizes that resolving this issue now is in the interest of judicial efficiency and in furtherance of Rule 8(f)'s mandate to construe all pleadings so as to do "substantial justice."

### B. AMO's financial responsibilities toward Rockhill

The AMO's Medical Plan is run by its Trustees and Administrators, and governed by ERISA. ERISA itself does not provide the court with a standard to review the decisions of plan administrators.  Thus, the courts have filled in the gap and provided a three tiered standard for reviewing administrators' plan decisions: " (1) de novo where the plan does not grant the administrator discretion [ i.e., does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the

administrator such discretion but] ⋯ [he has] ⋯ a conflict of interest. " <u>Williams v. Bellsouth Telecommunications</u>, 373 F.3d 1132, 1134-35 (11th Cir. 2004)(internal quotations omitted). In <u>Williams</u>, the court also provided a step by step approach for handling ERISA review cases. <u>Id.</u> at 1138. In the first step, the court "[a]ppl[ies] the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' ( i.e., the court disagrees with the administrator's decision);  if it is not, then end the inquiry and affirm the decision."  <u>Id.</u> The de novo standard provides for the highest judicial scrutiny to the administrator's decision and no deference is accorded to the administrator's decision.

The AMO Medical Plan and AMO Plan Summary set out the plan's provisions. Article V, Section 5.5.(A)(15)(a)-(d) is very clear about AMO's contractual responsibilities. The relevant parts state:

Section 5.5. - General Exclusions and Limitations

(A)     ...In addition, no payments shall be made under Article V or VI for:

15)     any charges incurred by or on behalf of any covered Participant or Dependent if such charges resulted from:

(a) an accidental bodily injury arising out of or in the course of employment; or

(b) an illness or disease for which the person is entitled to a benefit under any workers' compensation law, the Jones Act, or other maritime industry or common law; or

( c ) in the case of a Deep Sea of Inland Water participant, any injury or illness occurring on a vessel;

(d) in the case of a Deep Sea or Inland Water Participant, paragraphs (a), (b) and ( c ) above shall be waived for the first $10,000 of eligible expenses per occupational injury or illness occurring aboard a vessel of a company signatory to the AMO Medical Plan, in which case the Plan is authorized to reimburse the Participant, Employer or the Provider directly to the extent of the limit set forth in this subsection...

This provision is also summarized AMO's Summary Plan Description (Doc. 55-4, 13.) After a *de novo* review of the decision, the Court finds that the administrator correctly interpreted the plan and its exclusion. Since the illness occurred while Rockhill was on a vessel, AMO was responsible for $10,000 of Rockhill's medical expenses incurred in treating the small cell lung cancer. Finally, AMO is not responsible for Rockhill's medical expenses related to the treatment of his small cell lung cancer after he left Osprey on January 5, 2004 because AMO had already satisfied its obligations with respect to that specific illness.

### V. Rockhill's Motion for Summary Judgment

Rockhill's Cross Motion for Summary Judgment asks for punitive damages and attorney's fees, in addition to compensatory damages. As the issue of compensatory damages has already been addressed, it is clear that punitive damages (if available at all) are not appropriate in this case.

Rockhill alleges that he is entitled to attorney fees because Osprey terminated Rockhill's maintenance and cure "arbitrarily and willfully, without any adequate investigation being conducted into the status of his condition and treatment." (Rockhill Cross Motion for Summary Judgment on Counterclaim,  4.) Osprey denies Rockhill's allegations and argues that Rockhill has not presented the Court with any evidence that would indicate that its withdrawal of maintenance and cure showed "any evidence of dilatory practice on the part of the shipowner, much less substantial evidence of wrongful conduct..."

In Gaspard v. Taylor Diving& Salvage Co., Inc., 649 F.2d 372, 375 (5th Cir. 1981), the court held that attorney's fees are available to a seaman if in failing to provide maintenance and cure, the shipowner has been "callous and recalcitrant" or "arbitrary and capricious." See also, Vaughan v. N.J. Atkinson, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962)(holding that "admiralty courts are authorized to grant equitable relief" and "allowance of counsel fees and other expenses entailed by litigation...is part of the historic equitable jurisdiction of the federal court") (internal

quotation marks omitted); See also, Hines v. J.A. LaPorte, Inc., 820 F.2d 1187 (11th Cir. 1987)(holding that "reasonable attorney's fees" may be awarded to a seaman under the appropriate circumstances).[5]

Rockhill argues that because he "ask[ed] his treating physicians to be allowed to return to work while still maintaining his diagnosis and medical care" Osprey "arbitrarily and willfully" denied his payment of medical expenses. As a result, Rockhill alleges that his medical bills remained unpaid and that he was placed under "added stress above and beyond what his condition caused." Rockhill does not specifically identify which bills remain unpaid, or if those bills were paid were simply paid late. Osprey contends that its termination of benefits after February 2004 was not arbitrary and willful for the following reasons: 1) Osprey continued to pay Rockhill's medical bills after the brain metastasis was confirmed; 2) Osprey "initiated a through medical inspection in conjunction with this declaratory judgment action"; 3) Osprey attempted to arrange an interim solution for payment of Rockhill's expenses until the Court resolved the dispute; 4) All medical bills have been paid; and 5) There is no proof that Rockhill's condition has been affected in any way by this litigation.

First, based on the testimony of Rockhill's physicians, it is possible that Osprey could have terminated Rockhill's benefits as early as June 2003 when the tests revealed the brain metastasis. However, that claim is ultimately not persuasive in resolving this issue because there is no indication that Osprey actually investigated the matter from a medical perspective or that it had a detailed understanding of Rockhill's medical condition at that point in time. This is buttressed by the fact that when Osprey received the letter from Dr. Nichols indicating that it was his "opinion that Mr. Rockhill may return to work," (Doc. 47-2) Osprey did not question Rockhill or his physician about his illness at the time prior to allowing him back on a ship. As stated previously, Rockhill's return to

---

[5] Unlike the issue of punitive damages, the Supreme Court ruling in Miles v. Apex Marine Corporation, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) does not affect the awarding of attorney's fees. The Court does not find it necessary to make any specific finding on the issue of the availability of punitive damages in this Circuit after the Miles decision.

work did not automatically entitle Osprey to terminate his maintenance and cure. However, this letter is significant in that had the letter contained a summary of his current medical condition, Osprey may have denied Rockhill's request to return to work. Dr. Nichols' remark that had Rockhill had told him that "I want a letter that says I am totally disabled, I'm a dead man walking, I would have said here is your letter," (Nichols, 26:10-12) validates Oprey's beliefs to a certain extent. The rigors of working on a ship would have caused any employer to have second-thoughts about hiring an employee who was a "dead man walking." Thus, there is some merit in Osprey's contention that it took the letter to mean that Rockhill was "well and fit for duty" for purposes of evaluating Rockhill's claim for attorney's fees.

Second, the fact that Osprey has thoroughly investigated this claim after the initiation of this lawsuit is also unpersuasive, because that investigation was necessary to prove its claim.  Such an argument would be far more persuasive if Osprey had initiated an investigation of Rockhill's medical condition prior to filing this action. With respect to the payment of Rockhill's bills, Osprey attests that it has paid all of Rockhill's bills through the end of his employment with Osprey in early January, and none of the parties have submitted any evidence to rebut that claim. All bills after that point seem to have been cleared by AMO according to Dr. Malamud. (Malamud 6:22-24)(stating that all of his outstanding bills as of March 31, 2005, have been paid by AMO). If there are any other bills outstanding from any other physician, the Court has not been made aware of them. Nothing in the record indicates that Rockhill's condition has been aggravated by this lawsuit or any of Osprey's actions prior to the initiation of this declaratory action. The Court finds that Osprey's actions in terminating Rockhill's maintenance and cure do not justify an award of attorney's fees.

Accordingly,

**IT IS ORDERED**:

1.    Osprey's Motion for Summary Judgment (Doc. 48) is granted with the proviso that  Osprey shall pay all of Rockhill's medical bills, excepting

AMO's required payment of $10,000, related to the treatment of his small cell lung cancer from November 2002 through the end of Rockhill's employment with Osprey.

2.      AMO's Motion for Summary Judgment (Doc. 54) is granted to the extent that AMO is not responsible for Rockhill's medical expenses beyond the $10,000 provided by their rules; all remaining parts of AMO's Motion for Summary Judgment are denied.

3.      Rockhill's Motion for Summary Judgment (Doc. 57) is denied.

**ORDERED** on June 27, 2006.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**